UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x

DYNASTY STAINLESS STEEL & METAL INDUSTRIES, INC.,

Plaintiff,

v.

HILL INTERNATIONAL, INC.

Defendant.

---------------------------------------------------x

**MEMORANDUM AND ORDER**
17-CV-2345 (RPK) (RLM)

RACHEL P. KOVNER, United States District Judge:

Plaintiff Dynasty Stainless Steel & Metal Industries, Inc. ("Dynasty") brought this lawsuit against defendant Hill International, Inc. ("Hill") to resolve a dispute arising out of delays in a construction project. This Court stayed the lawsuit pending arbitration, *see Dynasty Stainless Steel & Metal Indus., Inc. v. Hill Int'l, Inc.*, No. 17-CV-2345 (KAM) (RLM), 2018 WL 4259776, at *1 (E.D.N.Y. Mar. 27, 2018), and an arbitrator issued an award denying Dynasty's claims. Dynasty now moves to vacate the arbitral award. For the reasons stated below, that motion is denied.

## BACKGROUND

### I. Factual Background

In 2010, the City University of New York ("CUNY") hired Hill to be the construction manager for a project to build a new performing arts center. *Ibid.* Hill in turn hired a subcontractor—E.W. Howell Co., LLC—to perform construction work under the contract. *Ibid.*

As the project moved forward, Howell's construction work fell behind schedule. *Ibid.* In an effort to speed up construction, Hill began soliciting bids for an additional subcontract. *Ibid.* The solicitation materials emphasized Hill's expectation that time was of the essence. The

materials stated, for example, that "this project has time critical time constraints. Contract Work is expected to begin by March 1, 2014, and attain substantial Completion of the Project, by November 15, 2014. This must be taken into account in the bid pricing." *Ibid.*

Dynasty submitted a bid for $10,790,000. *Ibid.* Hill selected Dynasty's bid and awarded it the subcontract. *Ibid.*

Although work under the subcontract was expected to be substantially complete in November 2014, the project site was not made available to Dynasty until April 2016. *Ibid.* Delays continued even after the site was made available. For example, Howell was still finishing its own work, which interfered with Dynasty's. *Ibid.* At some point, a "Stop Work Order" also prevented Dynasty from working for a significant period. *Ibid.*

In 2017, Hill terminated Dynasty. *Id.* at *2.

## II. Procedural History

Shortly after the termination, Dynasty filed this lawsuit. Its complaint brought several claims. Count One, for fraud in the inducement, alleged that Hill made a material misrepresentation when it stated that Dynasty's subcontract work was "expected to begin by March 1, 2014, and attain Substantial Completion . . . by November 15, 2014" because it knew this schedule was not feasible given Howell's delayed performance. Compl. at 3, ¶ 7 (Dkt. #1). Count Two, for fraud, claimed that Hill continued to make misrepresentations throughout the project, including by "with[holding] from Dynasty the fact that it knew [Howell's work] would not be substantially complete until well after" the target date for Dynasty's work. *Id.* at 6, ¶ 3. Count Three, for tortious interference with contract, asserted that Hill's termination of Dynasty amounted to an intentional interference with Dynasty's ability to obtain other contracts for public construction projects. *Id.* at 9–10. Count Four, for violation of trust law, claimed that Hill wrongly withheld from Dynasty certain funds that it received from CUNY and were owed to Dynasty. *Id.*

at 11–12. Count Five, for wrongful termination, alleged that Hill improperly terminated the subcontract. *Id.* at 12–13. Count Six, for discrimination, asserted that Hill discriminated against Dynasty, described in the complaint as a minority business enterprise, by terminating its contract but not terminating the contract of Howell, a company that is not a minority business enterprise and that performed work that was deficient or late. *Id.* at 14–15. Finally, Count Seven sought certain declaratory relief related to the proper interpretation of the subcontract. *Id.* at 16–17.

**A. Motion to Compel Arbitration**

Hill filed a motion to dismiss, or, in the alternative, to stay the proceedings pending arbitration. *See* Mot. to Dismiss 1 (Dkt. #12-8).

Hill's motion to stay the proceedings pending arbitration was based on a detailed dispute-resolution process laid out in Article 29 of the subcontract. Specifically, Article 29 provided that "all claims, controversies or disputes [Dynasty] may have against Hill . . . shall be resolved exclusively by the procedure set forth in this Article." Dynasty-Hill Contract at 41 (Dkt. #12-4). That procedure required Dynasty to submit its claims to the Executive Director of the Department of Design, Construction and Management of CUNY (the "Executive Director"), who would either facilitate a negotiated resolution or "issue written findings and resolve the Dispute unilaterally." *Id.* at 42–43. Article 29 further provided that Dynasty could appeal the Executive Director's decision to the Vice Chancellor for Facilities Planning, Construction and Management of CUNY (the "Vice Chancellor"). *Ibid.* If the Vice Chancellor failed to resolve the dispute "within thirty (30) consecutive calendar days of receiving the Notice of Appeal," or if "[Dynasty] receives from the Vice Chancellor a written final decision with which [Dynasty] disagrees," the contract provided that Dynasty's "only remedy shall be an appeal pursuant to Article 78 of the Civil Practice Laws and Rules of the State of New York." *Id.* at 43.

In light of the contractual arbitration requirement, Judge Matsumoto, to whom this case was originally assigned, granted Hill's motion to stay the proceedings pending arbitration before the Executive Director. *See Dynasty Stainless Steel*, 2018 WL 4259776, at *1.

**B. Arbitration**

The parties then engaged in the dispute resolution process described in Article 29 of the contract, after which the Executive Director issued a written opinion denying Dynasty's claims. *See* Unilateral Resolution 5, 12 (Dkt. #79-10) (PDF pagination). The Executive Director's decision was based on multiple grounds.

First, the Executive Director determined that most of the damages Dynasty sought were precluded by a no-damages-for-delay clause in the contract. That clause stated that "[Dynasty] may encounter delays attributable to Hill, . . . including . . . those which are unexpected and unforeseeable," and that "[Dynasty] agrees that it shall be fully and wholly compensated for each such delay solely and exclusively by an extension of time to complete performance of the Work." *Id.* at 6 (citing Dynasty-Hill Contract 18–19).

Second, the Executive Director found that Dynasty failed to comply with a contractual provision requiring that it provide prompt notice of any claims to Hill. *See id.* at 8.

Third, the Executive Director concluded that Dynasty's claims otherwise failed on the merits. He explained that the wrongful-termination claim failed because there was "sufficient evidence to show that Dynasty defaulted" and that "Hill was within its rights" to terminate the subcontract. *Id.* at 10. The fraud and fraud-in-the-inducement claims were denied because the Executive Director determined that "Dynasty was not justified in relying on the statement in the Subcontract" regarding the project's completion date because other provisions in the contract stated that the work would take much longer. *Ibid.* The Executive Director further found that

Dynasty could not establish tortious interference because there were no contractual relationships with which Hill interfered. *Id.* at 11. He also determined that Dynasty failed to provide evidence that Hill withheld payments in violation of trust fund law, and that there was no evidence of discrimination or disparate treatment. *Id.* at 12. Finally, the Executive Director rejected Dynasty's claim that it was owed money for certain "change orders," explaining that the parties' change-order log did not show any outstanding amounts. *Ibid.*

Shortly after the Executive Director's decision, Dynasty filed a notice of appeal to the Vice Chancellor. Decl. of Counsel in Supp. of Mot. to Vacate ¶ 18 (Dkt. #79-3). More than three years passed without the Vice Chancellor addressing Dynasty's appeal. *Id.* ¶ 20.

**C. Motion to Vacate**

After waiting more than three years, Dynasty filed this motion seeking to vacate the arbitral award. *See* Mot. to Vacate (Dkt. #79). In the motion, Dynasty raises several objections to the Executive Director's decision. First, Dynasty claims that the Executive Director was biased because he was employed by CUNY, and CUNY allegedly admitted during the mediation process that it shared liability with Hill and offered to pay a portion of Dynasty's damages. Mem. of L. in Supp. of Mot. to Vacate 16–18 (Dkt. #79-1). Second, Dynasty contends that the Executive Director manifestly disregarded the law by ignoring certain judicial exceptions to no-damages-for-delay clauses and by considering the change-order log, which Dynasty claims was confidential information exchanged during mediation. *Id.* at 18–21. Third, Dynasty argues that the Executive Director committed misconduct by engaging in *ex parte* communications and by deciding the case before Dynasty could present evidence stemming from a Freedom of Information Law ("FOIL") request served on CUNY. *Id.* at 21–24. Finally, Dynasty argues that the Executive Director violated its procedural due process rights. *Ibid.*

## STANDARD OF REVIEW

The FAA and state law both provide standards governing judicial review of arbitral awards. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 590 (2008). The standard articulated in the FAA "represent[s] a floor for judicial review of arbitration awards below which" courts may not go. *Hoeft v. MVL Grp., Inc.*, 343 F.3d 57, 64 (2d Cir. 2003). Otherwise, however, when a "contract specifies that any appeal from an arbitration award is to be governed exclusively by . . . state law, [that] designation must be honored by the courts unless the state law conflicts with federal law." *Cnty. of Nassau v. Chase*, 402 F. App'x 540, 541 (2d Cir. 2010).

The standard for review of arbitral awards under New York law substantively tracks the FAA. *See Mahn v. Major, Lindsey, & Africa, LLC*, 74 N.Y.S.3d 7, 8 (App. Div. 2018) (describing the two as "nearly identical"); *DeVary v. Nat'l Sec. Corp.*, No. 21-CV-7869 (DEH), 2024 WL 4444280, at *3 (S.D.N.Y. Oct. 8, 2024) (observing that "[t]here is little practical difference between" them); *Hall St. Assocs.*, 552 U.S. at 589 n.7 ("The text of the FAA was based upon that of New York's arbitration statute."). Under Article 75 of the New York Civil Practice Law and Rules, an arbitration award may be vacated only when the party seeking vacatur was "prejudiced by: (i) corruption, fraud or misconduct in procuring the award; or (ii) partiality of an arbitrator . . .; or (iii) an arbitrator exceeded his power or so imperfectly executed it that a final and definite award upon the subject matter submitted was not made; or (iv) failure to follow the procedure of this article." N.Y. C.P.L.R. § 7511(b)(1). Because this standard does not conflict with the FAA, the FAA "does not preempt New York state law here." *Chase*, 402 F. App'x at 542.

## DISCUSSION

The motion to vacate is denied. New York law, not the FAA, governs Dynasty's challenge to the arbitrator's award. While New York law permits review of the primary arguments that

Dynasty has made in support of vacating the award, Dynasty has not established one of the narrow circumstances that would support vacatur.

**I. Choice of Law**

The law governing Dynasty's motion to vacate is determined by the sole-remedy clause in the parties' contract. Dynasty's "only remedy" from an adverse arbitration award is an appeal under "the Civil Practice Laws and Rules of the State of New York." Dynasty-Hill Contract 43.

The sole-remedy clause is not displaced by the apparent scrivener's error it contains. While the sole-remedy clause provides that review shall be under "Article 78 of the Civil Practice Laws and Rules of the State of New York," *ibid.*, New York's "exclusive method for review of an arbitration award which is the result of a voluntary contractual arbitration procedure is contained in Article 75 of the CPLR," not Article 78, *Honeywell, Inc. v. Firequench, Inc.*, No. 96-CV-694 (DLC), 1997 WL 570514, at *4 (S.D.N.Y. Sep. 12, 1997); *see Caso v. Coffey*, 41 N.Y.2d 153, 156–57 (1976). But courts applying New York law correct errors in contracts "when the error is obvious and the drafters' intention clear," as in the case of "a scrivener's error," *Slifka v. Slifka*, 111 N.Y.S.3d 301, 303 (App. Div. 2019), which may be evident when a word used in a contract would render a contractual provision "meaningless," *NCCMI, Inc. v. Bersin Props., LLC*, 208 N.Y.S.3d 27, 33 (App. Div. 2024), or "unenforceable," *MAK Tech. Holdings, Inc. v. Anyvision Interactive Tech. Ltd.*, 42 N.Y.3d 570, 576 (2024) (citation omitted). That is the situation here: by writing "Article 78" instead of "Article 75"—a change of one digit—the parties committed an apparent drafting error that would make the provision governing judicial review of arbitration awards "meaningless," *NCCMI,* 208 N.Y.S. 3d at 33, or "unenforceable," *MAK Tech. Holdings*, 42 N.Y.3d at 576 (citation omitted).

Application of scrivener's error principles finds some support in the many court decisions involving legal filings that inappropriately invoke Article 78. New York courts faced with lawsuits

invoking Article 78 for review of an arbitrator's award routinely convert the proceeding into one under Article 75. *See, e.g.*, *Masciarelli v. N.Y.C. Dep't of Educ.*, 237 N.Y.S.3d 636, 750–51 (App. Div. 2025) (converting proceeding under Article 78 into one under Article 75 because movant sought review of an arbitration award); *Rosa v. City Univ. of N.Y.*, 789 N.Y.S.2d 4, 5 (App. Div. 2004) ("Although characterized by petitioner as an article 78 [proceeding], the instant proceeding, which . . . would, if successful, effectively nullify the arbitrator's decision, is actually in the nature of a CPLR article 75 proceeding seeking to vacate an arbitration award."); *Kubiak v. Derenda*, 55 N.Y.S.3d 838, 839 (App. Div. 2017); *Long v. Mellen*, 536 N.Y.S.2d 703, 703 (Mem.) (App. Div. 1988); *Malatestinic v. Bd. of Educ. of City of New York*, 518 N.Y.S.2d 34, 35–36 (App. Div. 1987). A federal court has done the same. *Honeywell*, 1997 WL 570514, at *3. The fact that courts consistently exercise their discretion in this way suggests that they understand review of an arbitration award under Article 75 to achieve the aims of parties who purport to seek such review under Article 78.

Dynasty's argument that neither Article 78 nor Article 75 should apply is unavailing. According to Dynasty, the law of the case entitles it to review under Section 10(a) of the FAA because Judge Matsumoto already decided that "the Federal Arbitration Act applied to the dispute resolution provision" of the parties' contract. Reply Br. in Supp. of Mot. to Vacate ("Reply Br.") 4 (Dkt. #81). While it is true that Judge Matsumoto determined that the parties' contract included an "agreement to arbitrate" that is "valid, irrevocable, and enforceable" under the FAA, *see Dynasty Stainless Steel*, 2018 WL 4259776, at *3–5, that is very different from determining that every provision of the FAA, including Section 10(a), applies to the parties' dispute for any and all purposes. Because Judge Matsumoto's decision did not address the substantive standard that is to govern judicial review of the arbitral award, that issue is not resolved by the law of the case.

## II. Grounds for Vacatur

The arguments Dynasty presents in its briefs primarily invoke grounds for vacatur that are available under not only under the FAA but also under Article 75, which contains standards for arbitral review "nearly identical" to those provided in Section 10(a) of the FAA. *Mahn*, 74 N.Y.S.3d at 8. And the Court has jurisdiction to review those arguments under the standards of Article 75 because this lawsuit was brought under diversity jurisdiction, thereby allowing the Court to adjudicate the merits of a state law dispute. Nevertheless, insofar as Dynasty's presentation of these arguments is read as seeking vacatur of the arbitral award under Article 75, Dynasty's arguments fail on the merits.

### A. Bias

First, Dynasty asserts the Executive Director, who arbitrated the parties' dispute, was biased because of his association with CUNY.

Article 75 permits a court to vacate an arbitral award where a party was "prejudiced by . . . partiality of an arbitrator." N.Y. C.P.L.R. § 7511(b)(1). But "assent by a party to the choice of an arbitrator in the face of that party's knowledge of a relationship between the other side and the arbitrator is a waiver of his right to object." *Siegel v. Lewis*, 389 N.Y.S.2d 800, 802 (1976); *see Progress Bulk Carriers v. Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc.*, No. 12-CV-264 (ALC), 2016 WL 11943610, at *4 (S.D.N.Y. Mar. 17, 2016) ("[I]f a party goes forward with arbitration, having actual knowledge of the arbitrator's bias, or of facts that reasonably should have prompted further, limited inquiry, it may not later claim bias based upon the failure to disclose such facts." (quoting *J.P. Stevens & Co. v. Rytex Corp.*, 356 N.Y.S.2d 278, 282 (1974)); *Yonkers Contracting Co., Inc. v. Port Auth. Trans-Hudson Corp.*, 640 N.Y.S.2d 866, 867 (1996) ("[P]arties to an arbitration contract are completely free to agree upon the identity of the arbitrators, and New York courts have therefore regularly refused to disqualify arbitrators on grounds of conflict of

interest or partiality even in cases where the contract expressly designate[s] a single arbitrator . . . employed by one of the parties." (internal quotation marks and citation omitted)).

Here, Dynasty knew of the relationship between the Executive Director and CUNY before entering into the arbitration agreement. After all, his job title, which is referenced in the agreement, is "the Executive Director of the Department of Design, Construction and Management *of CUNY*." Dynasty-Hill Contract 42 (emphasis added). And even if Dynasty had grounds to object to the Executive Director's relationship with CUNY, it fails to identify any evidence that it was prejudiced by the relationship. As a result, there is no basis under Article 75 to set aside the award for partiality.

**B. Manifest Disregard of the Law**

Dynasty's next assertion is that the Executive Director manifestly disregarded the law. While manifest disregard of the law "is the federal, not state, standard," *Chase*, 402 F. App'x at 542, the approximately equivalent standard under New York law "is whether the arbitration award 'violates a strong public policy, is irrational or clearly exceeds a specifically enumerated limitation on the arbitrator's power.'" *Ibid.* (quoting *N.Y.C. Transit Auth. v. Transp. Workers' Union of Am., Local 100, AFL-CIO*, 812 N.Y.S.2d 413, 415 (2005)).

Dynasty has not demonstrated that the Executive Director's decision falls in this category. Dynasty's first argument is that the Executive Director misapplied the caselaw establishing certain judicial exceptions to no-damages-for-delay clauses. Indeed, some caselaw treats no-damages-for-delay clauses as inapplicable when the construction site is not made available at all or when the delays were unforeseeable. *See* Mem. of L. in Supp. of Mot. to Vacate 20. But the Executive Director did not ignore this caselaw—he explicitly addressed it, stating that these default exceptions did not apply because "the Subcontract explicitly precludes recovery for even uncontemplated delays." Unilateral Resolution 7. None of the cases cited by Dynasty address a

factual circumstance where the no-damages-for-delay clause expressly covered unforeseeable delays. *See, e.g.*, *Wilson & Eng. Constr. Co. v. N.Y. Cent. R.R. Co.*, 269 N.Y.S. 874, 877 (App. Div. 1934) (declining to enforce a clause stating that there shall be no damages for "delay caused in [the] work by the Company" because "the owner fail[ed] to provide the place"); *Peckham Rd. Co. v. State*, 300 N.Y.S.2d 174, 176 (App. Div. 1969) ("The rule is well established that a contractor is entitled to a reasonable opportunity to perform his contract without obstruction or interference and that the State may be held liable for failure to furnish such opportunity *unless it has relieved itself by express language in the contract*." (emphasis added)); *Cauldwell-Wingate Co. v. State*, 276 N.Y. 365, 375 (1938) (emphasizing that the no-damages-for-delay clause contains "no reference to [the] delays and damages caused"); *People ex rel. Wells & Newton Co. of New York v. Craig*, 232 N.Y. 125, 142–43 (1921) (declining to enforce no-damages-for-delay clause where the delay was uncontemplated and the clause simply stated there would be no damages "[i]f the work be delayed"). Since the Executive Director "adduced facts and explained how those facts support[ed] [his] ultimate decision," his decision cannot be characterized as irrational. *Motor Vehicle Accident Indem. Corp. v. Aetna Cas. & Sur. Co.*, 652 N.Y.S.2d 584, 588 (1996).

Dynasty's second basis for manifest disregard of the law—that the Executive Director improperly violated mediation confidentiality when he considered a change-order log—fares no better. While Dynasty asserts that the change-order log was a document exchanged in connection with the mediation, and was therefore covered by the mediation privilege, *see* Mem. of L. in Supp. of Mot. to Vacate 20–21, Hill maintains that the document was merely "exchanged near the time of mediation," Opp. to Mot. to Vacate 17 (Dkt. #80). Even if the arbitrator incorrectly decided the question of whether the change-order log qualified as privileged, "[a]n arbitration award . . . will not be overturned merely because the arbitrator committed an error of fact or of law." *Aetna*

*Cas. & Sur. Co.*, 652 N.Y.S.2d at 588. Accordingly, Dynasty's arguments related to manifest disregard of the law do not provide a basis to set aside the arbitral award.

### C. Misconduct

Next, Dynasty asserts the Executive Director committed misconduct because he discussed the case "with project personnel outside the presence of the parties," Mem. of L. in Supp. of Mot. to Vacate 23, and because he decided the case without waiting for CUNY's response to Dynasty's FOIL request.

Article 75 permits a court to vacate an arbitral award where a party was "prejudiced by . . . corruption, fraud, or misconduct in procuring the award." N.Y. C.P.L.R. § 7511(b)(1). Under some circumstances, *ex parte* communications may satisfy this standard. *See Goldfinger v. Lisker*, 68 N.Y.2d 225, 231 (1986); *see also Paluch v. Kohn*, 165 N.Y.S.3d 601, 603 (App. Div. 2022). The party asserting misconduct, however, must demonstrate it "by clear and convincing proof." *Motor Vehicle Accident Indem. Corp. v. N.Y.C. E.-W. Acupuncture, P.C.*, 910 N.Y.S.2d 38, 41 (App. Div. 2010) (citation omitted). Moreover, where an "independent investigation" by the arbitrator is "authorized by the parties," the arbitrator may "predicate their award" on that investigation without running afoul of the prohibition on *ex parte* communications. *Goldfinger*, 68 N.Y.2d at 231.

Here, the contract itself required the Executive Director to "investigate" the dispute, including by meeting with Dynasty, Hill, and relevant "staff." Dynasty-Hill Contract 43. As a result, the arbitrator was entitled to discuss the case with project personnel. And even if he were not entitled to have those discussions, Dynasty fails to identify any evidence that it was prejudiced by them. The Executive Director's stated reasoning did not rely on any *ex parte* conversations, and there is no evidence in the record suggesting that his reasoning would have been different in the absence of such conversations.

Under some circumstances, an arbitrator's refusal to hear evidence may also qualify as "misconduct in procuring the award." N.Y. C.P.L.R. § 7511(b)(1); *see Professional Staff Congress/City Univ. of N.Y. v. Bd. of Higher Educ. of the City of N.Y.*, 39 N.Y.2d 319, 323 (1976). "A refusal to grant an adjournment" in order to wait for additional evidence, however, "constitutes 'misconduct' . . . only when it results in the failure to hear pertinent and material evidence and in the effective exclusion of an entire issue." *Campbell v. N.Y.C. Transit Auth.*, 821 N.Y.S.2d 27, 29 (App. Div. 2006); *see In re Bevona*, 611 N.Y.S.2d 193, 195 (App. Div. 1994) (emphasizing "the effective exclusion of an entire issue"); *N.Y.C. E.-W. Acupuncture, P.C.*, 910 N.Y.S.2d at 41 ("Arbitral misconduct is established not by the refusal of an adjournment, but where the refusal forecloses 'the presentation of . . . evidence to the [movant]'s prejudice.'" (citation omitted)). Otherwise, the decision to end discovery and resolve a case "fall[s] within the sound exercise of an arbitrator's discretion." *Campbell*, 821 N.Y.S.2d at 29.

Here, Dynasty has not demonstrated that the arbitrator's decision to resolve the case before waiting for CUNY's response to the FOIL request effectively excluded an entire issue or otherwise prejudiced it. Dynasty concedes that "it is impossible to know" what the FOIL request would have produced and proceeds to offer only speculation. Mem. of L. in Supp. of Mot. to Vacate 24. Its speculation cannot carry its burden of demonstrating prejudicial misconduct by "clear and convincing proof." *N.Y.C. E.-W. Acupuncture, P.C.*, 910 N.Y.S.2d at 41. Accordingly, there is no basis under Article 75 to set aside the award for misconduct.

**D. Due Process**

Finally, Dynasty asserts that the Executive Director violated its procedural due process rights in various ways. It is not clear that a due process argument is cognizable under Article 75. Nevertheless, the argument fails on the merits. To prevail on a procedural due process claim, Dynasty must show that it "possessed a protected liberty or property interest, and that [it] was

deprived of that interest without due process." *McMenemy v. City of Rochester*, 241 F.3d 279, 286 (2d Cir. 2001). Dynasty has not done so. It identifies no protected liberty or property interest of which it was deprived. It simply asserts that the "Fifth and Fourteenth Amendments of the Constitution require due process," Mem. of L. in Supp. of Mot. to Vacate 21, and that the Executive Director committed a "fundamental breach of [its] right to a fair hearing," Reply Br. 10. And even if Dynasty did show it had a protected property or liberty interest, there would be no due process violation. "Where, as here, a given procedure includes 'some form of pre-deprivation hearing' and post-deprivation remedies with 'the opportunity to obtain full judicial review,' the 'combination' of the two provide due process." *Doolen v. Wormuth*, 5 F.4th 125, 135 (2d Cir. 2021) (citation omitted).

**CONCLUSION**

For the foregoing reasons, the motion to vacate the arbitral award is denied.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: September 24, 2026
Brooklyn, New York